UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BETTY J. RAMEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:25-cv-01178-SRC |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**Memorandum and Order**

Betty J. Ramey argues that the United States owes her money under the Federal Tort

Claims Act (FTCA) for property damage that occurred while members of the United States

Marshals Service (USMS) were arresting her nephew.  The United States moves to dismiss,

arguing that an exception to the FTCA shields it from suit.  Because the exception applies, the

Court lacks jurisdiction over Ramey's claim and therefore dismisses this case without prejudice.

I.      **Background**

A.      **Factual background**

In September 2024, members of the USMS arrived at Ramey's home to arrest her

nephew, Brandon White, pursuant to an arrest warrant.  Doc. 2 at 1, 4, 7; doc. 13-1 at 1–2, 5 (The

Court cites to page numbers as assigned by CM/ECF.).  The Marshals knocked and announced

their presence and told Ramey that they would kick down the door if she did not open it.  Doc. 2

at 1–2; *see* doc. 13-1 at 3.  After receiving no response from Ramey, the Marshals kicked down

the front door and instructed Ramey to exit her home.  Doc. 2 at 2; doc. 13-1 at 3.  The Marshals

then arrested White, doc. 13-1 at 3; *see also* doc. 2 at 4 (noting that White has been incarcerated

since September 2024) and provided Ramey with a Standard Form 95 to request reimbursement

for the damage to her home, *see* doc. 2 at 7; doc. 13-1 at 3.  Shortly after her nephew's arrest,

Ramey completed and submitted the form, *see* doc. 13-2; doc. 2 at 7, but the USMS denied her

request in February 2025, *see* doc. 13-3 at 2; doc. 2 at 7.  Ramey then submitted a request for

reconsideration, doc. 13-3 at 1, but appears to have abandoned this request by filing suit in

March 2025, *see* doc. 2 at 1; 28 C.F.R. § 14.9(b) (noting that, "[u]pon the timely filing of a

request for reconsideration" under the FTCA, the federal agency "shall have 6 months from the

date of filing in which to make a final disposition of the claim").

>   **B.      Procedural background**

Ramey sued the USMS in the Circuit Court of St. Louis County, Missouri in March 2025.

*See* doc. 2 at 1.  The USMS removed this case to federal court in August 2025, *see* doc. 1, and

moved to substitute the United States as the proper defendant, *see* doc. 6, which the Court

granted, *see* doc. 8.  Then, in  September 2025, the United States moved to dismiss Ramey's case

under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction.  Doc. 12 at

1.  Ramey did not respond to this motion by her deadline.  *See* E.D.Mo. L.R. 4.01(B); doc. 14 at

1.  So the Court ordered Ramey to explain no later than November 5, 2025:  (i) why she failed to

respond to the United States' motion; (ii) why the Court should not dismiss her case for failure to

prosecute; and (iii) why the Court should not summarily grant the United States' motion.  Doc.

14 at 1–2.  The Court also ordered Ramey to file any response in opposition to the motion by the

same date.  *Id.* at 2.  On November 3, 2025, Ramey filed a response to the Court's Show-Cause

Order.  *See* doc. 15.  Ramey did not, however, respond to the United States' Motion to Dismiss.

*See id.*  The motion is now ripe for the Court's review.

2

II.     **Standard**

A.      **Motion to dismiss under Rule 12(b)(1)**

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may move to dismiss for lack of subject-matter jurisdiction.  "Because of the unique nature of the jurisdictional question, it is the court's duty to decide the jurisdictional issue, not simply rule that there is or is not enough evidence to have a trial on the issue."  *Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019) (cleaned up).  "[T]he district court must distinguish between a facial attack—where it looks only to the face of the pleadings—and a factual attack—where it may consider matters outside the pleadings."  *Croyle ex rel Croyle v. United States*, 908 F.3d 377, 380 (8th Cir. 2018) (citing *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990)).

Where, as here, a party brings a factual attack, "the court considers matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards."  *Davis v. Anthony, Inc.*, 886 F.3d 674, 679 (8th Cir. 2018) (quoting *Osborn*, 918 F.2d at 729 n.6).  "[T]he court may receive evidence via 'any rational mode of inquiry,' and the parties may 'request an evidentiary hearing.'"  *Buckler*, 919 F.3d at 1044 (quoting *Osborn*, 918 F.2d at 730).  "[T]he party invoking federal jurisdiction must prove jurisdictional facts by a preponderance of the evidence."  *Moss v. United States*, 895 F.3d 1091, 1097 (8th Cir. 2018) (citing *OnePoint Sols., LLC v. Borchert*, 486 F.3d 342, 347 (8th Cir. 2007)).

"[T]he court must rule upon the jurisdictional issue unless it is so bound up with the merits that a full trial on the merits may be necessary to resolve the issue."  *Buckler*, 919 F.3d at 1044 (cleaned up).  "If the jurisdictional issue is 'bound up' with the merits it remains within the district court's discretion to decide whether to evaluate the evidence under the summary judgment standard."  *Moss*, 895 F.3d at 1097 (citing *Gulf Oil Corp. v. Copp Paving Co.*, 419

3

U.S. 186, 203 n.19 (1974)).  In sum, the Court may do the following on a factual attack: (1) consider evidence outside the pleadings, such as affidavits or other documents; (2) hold an evidentiary hearing; (3) evaluate the evidence under the summary judgment standard; or even (4) proceed to a full trial.  *See id.*; *see also Buckler*, 919 F.3d at 1044.  As discussed below, the Court decides this motion by considering Ramey's Petition and the evidence the United States submitted.

The Court liberally construes complaints filed by self-represented litigants.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  "Liberal construction" means that "if the essence of an allegation is discernible," the Court should "construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework."  *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015) (quoting *Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004)).

**B.      Discretionary-function exception**

Sovereign immunity shields the United States from suit absent its consent.  *Croyle*, 908 F.3d at 381 (citing *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)).  The Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), waives this immunity for some tort claims and authorizes private suits for the negligence of federal government agents.  *Id.*  But this waiver has limits.  *Id.*  For instance, under 28 U.S.C. § 2680(a), a plaintiff may not sue a federal government agent for "the exercise or performance or the failure to exercise or perform a discretionary function or duty."  28 U.S.C. § 2680(a); *see also Croyle*, 908 F.3d at 381.  Courts refer to this limitation as the "discretionary function exception."  *Croyle*, 908 F.3d at 381.  "If the Government's conduct is within the discretionary function exception, 'the federal court lacks subject matter jurisdiction.'"  *Id.* (quoting *Hinsley v. Standing Rock Child Protective Servs.*, 516 F.3d 668, 672 (8th Cir.2008)).

Courts engage in a two-step analysis to determine whether the discretionary-function exception applies. *Buckler*, 919 F.3d at 1045. First, the Court must ask "whether the challenged conduct or omission is truly discretionary"—that is, "whether it involves an element of judgment or choice instead of being 'controlled by mandatory statutes or regulations.'" *Herden v. United States*, 726 F.3d 1042, 1046 (8th Cir. 2013) (quoting *United States v. Gaubert*, 499 U.S. 315, 328 (1991)). And then, if the challenged action is discretionary, the Court must ask "whether the government employee's judgment or choice was 'based on considerations of social, economic, and political policy.'" *Id.* (quoting *Layton v. United States*, 984 F.2d 1496, 1499 (8th Cir. 1993)). Importantly, "as long as a discretionary decision is susceptible to policy analysis," the discretionary-function exception applies, regardless of whether the defendant engaged in "conscious policy-balancing." *Buckler*, 919 F.3d at 1045 (quoting *Herden*, 726 F.3d at 1047) (cleaned up). And "if qualifying discretion exists, the exception applies regardless of whether the government employee abuses that discretion." *Id.*; *see also* 28 U.S.C. § 2680(a) (limiting the United States' waiver of sovereign immunity "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused"). Finally, if discretion exists, the Court should presume "that the discretion is grounded in policy considerations," and the plaintiff "must rebut this presumption." *Buckler*, 919 F.3d at 1046 (quoting *Herden*, 726 F.3d at 1048).

### III.   Discussion

#### A.   Show-cause order

In its Show-Cause Order, the Court directed Ramey to respond no later than November 5, 2025.  Doc. 14 at 1–2.  Because Ramey filed her response before this deadline, *see* doc. 15, the Court discharges its Show-Cause Order, doc. 14.

#### B.   Motion to dismiss

In her Petition, Ramey seeks reimbursement from the USMS for damage to her front door.  Doc. 2 at 7; *see also* doc. 15 at 1 ("All I want is to be paid for the unnecessary break-in the angry police did to my little shack of a house.").  Construing her Petition liberally, *see Estelle*, 429 U.S. at 106, the Court finds that Ramey challenges the Marshals' decision to kick down her front door to arrest White.  The United States argues that this conduct falls within the discretionary-function exception, barring Ramey's claim and depriving the Court of subject-matter jurisdiction.  Doc. 13 at 2–3.

##### 1.   Discretion

In examining whether the Marshals exercised discretion, the Court assesses whether the Marshals' decision involved "an element of judgment or choice," or whether "a federal statute, regulation, or policy mandate[d] a particular action."  *Croyle*, 908 F.3d at 381.  Federal law provides for the powers and duties of the USMS.  *See* 28 U.S.C. § 566; 18 U.S.C. § 3053.  Section 566 states that the Marshals "shall execute all lawful writs, process, and orders issued under the authority of the United States."  28 U.S.C. § 566(c).  While this general directive uses mandatory language, the statute also describes more specific aspects of the Marshals' duties in permissive language.  *See* 28 U.S.C. § 566(d) (stating that a Marshal "may carry firearms and make arrests without warrant for . . . any felony cognizable under the laws of the United States"

if he has reasonable grounds to believe that the arrestee has committed a felony); *see also* 18 U.S.C. § 3053 (noting that Marshals "may carry firearms and may make arrests without warrant" for offenses against the United States).  Importantly, these statutes do not specify how the Marshals must make an arrest.  Nor do federal regulations provide any clarity.  *See generally* 28 C.F.R. § 0.111.  The Court must therefore examine any policy directives that govern the Marshals' conduct.  *See Croyle*, 908 F.3d at 381

United States Marshals Service Policy Directive 8.9 sets forth the USMS' policy regarding arrests.  *See* doc. 13-4 at 5.  Some aspects of this policy directive are mandatory, *see, e.g.*, *id.* at 6 (explaining knock-and-announce requirement), but others are not.  For example, the policy directive does not mandate that the Marshals take a particular course of action when entering a residence to arrest someone.  Rather, the directive gives the Marshals multiple options, including (i) obtaining voluntary consent of the "person in authority over the residence," (ii) using force; (iii) determining that exigent circumstances exist; (iv) using a search warrant; and (v) using subterfuge, ruse, or deception.  *Id.* at 8–10.  Thus, the Marshals have discretion in deciding which option to use.  *Cf. C.R.S. by D.B.S. v. United States*, 11 F.3d 791, 799 (8th Cir. 1993) (noting that an agency policy "strips government employees of discretion" only when it "specifically prescribes a course of action for an employee to follow" (quoting *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988))).

Here, the Marshals opted to use force to enter Ramey's residence.  *See* doc. 2 at 2; doc. 13-1 at 3.  The policy directive requires that three elements be present before the Marshals may use such force.  First, the residence must be a "first-party residence."  Doc. 13-4 at 9.  Second, the Marshals must have a valid arrest warrant.  *Id.*  And third, the Marshals must have "probable

cause to believe that the subject of the arrest warrant is inside" the residence. *Id.* Thus, this provision of the policy directive has some mandatory elements.

Once the Marshals meet these elements, however, the policy directive gives them discretion over whether and how to use force to enter the residence. Indeed, the provision uses permissive language when discussing the use of force. *See id.* (stating that entry "may be accomplished with force" in certain situations). Additionally, the provision is silent about how the Marshals may use force to enter the residence, *see id.*, further indicating that the use of force is discretionary. *Cf. Deuser v. Vecera*, 139 F.3d 1190, 1194–95 (8th Cir. 1998) (finding that, although National Park Service rangers had mandatory procedures for processing arrestees, they retained discretion over whether to make or terminate an arrest because the policy did not speak to that decision); *C.R.S*, 11 F.3d at 799 (quoting *Berkovitz*, 486 U.S. at 536)). And finally, the use-of-force provision stands in contrast to an immediately adjacent provision in the same subsection, which discusses the mandatory knock-and-announce requirement. *See* doc. 13-4 at 9 ("USMS personnel *must* comply with the 'knock and announce' requirements under the Fourth Amendment . . . ." (emphasis added)). Thus, the policy directive gives the Marshals discretion over the use of force in certain situations.

Next, the Court must determine whether the Marshals met the elements of the policy directive that allow them to exercise discretion. The Court finds that they have. First, the Marshals obtained an arrest warrant for White six days before they arrested him. *See* doc. 13-1 at 1–2, 5; *see also* Arrest Warrant, *United States v. White*, 4:24-cr-00484-SEP-1 (E.D. Mo. Sept. 23, 2024), doc. 18 (noting that court issued arrest warrant for White on September 12, 2024 and that Marshals executed the warrant on September 18, 2024).

Second, the declaration of Agent Horalek (a Deputy U.S. Marshal who led the arrest team for White) establishes that the Marshals believed that Ramey's home was White's first-party residence. Doc. 13-1 at ¶¶ 4–6. Policy Directive 8.9 defines first-party residence as "[t]he place where the subject of an arrest warrant resides or where there is evidence that the subject intends to stay." Doc. 13-4 at 16. It further states that a subject "resides" at the location where the subject "habitually lives"—that is, a place where the subject lives "with some regularity." *Id.* Notably, under this definition, "[a] person may have more than one first party residence." *Id.* In his declaration, Agent Horalek states that he analyzed commercial and law enforcement databases, which "established that White was living at 5247 Hodiamont Avenue, St. Louis, MO 63136 with his aunt, Betty Ramey." Doc. 13-1 at ¶ 4. Specifically, these databases revealed that the Hodiamont address "was listed as White's address of record on his Missouri driver's license," and that White "had a 2013 silver Chevrolet Sonic registered in his name at the same address." *Id.* Further, Agent Horalek "conducted surveillance prior to the arrest and observed the 2013 silver Chevrolet Sonic parked in front of 5247 Hodiamont Avenue at different times." *Id.* at ¶ 5. Thus, Agent Horalek concluded that the Hodiamont address was a first-party residence for White. *Id.* at ¶ 6.

Ramey does not contest that White lived at her home with some regularity. *See generally* docs. 2, 15. In fact, on her Standard Form 95, Ramey states that the Marshals "kicked in [her] doors and busted their way into [White's] room." Doc. 13-2 at 1. And in her request for reconsideration, Ramey notes that "[White] was asleep in his bedroom" at the time the Marshals arrived. Doc. 13-3 at 1. Ramey's statements indicate that White had his own room in her home. Thus, Ramey's home was a first-party residence for White. *See* doc. 13-4 at 16.

9

Third, Agent Horalek's declaration establishes that the Marshals had probable cause to believe that White was present inside Ramey's residence on the morning of September 18, 2024. *See* doc. 13-1 at 2. He states that the silver Chevrolet Sonic registered to White "was parked on the street directly in front of [Ramey's] residence" just before the arrest. *See id.* And St. Louis County Police had previously arrested White in this vehicle a few months earlier, in May of 2024, further indicating that the vehicle was White's. *Id.* at 2–3. Ramey does not contest that the vehicle was White's or that it was parked outside her residence on the morning of White's arrest. *See generally* docs. 2, 15. Thus, the Marshals had probable cause to believe White was inside Ramey's residence on the morning of September 18, 2024. And finally, the parties do not dispute that the Marshals complied with the mandatory knock-and-announce requirement in the policy directive. Doc. 13-1 at 3; *see also* doc. 2 at 2 (noting that Ramey heard "thunderous beatings" on her front door, as well as a loud voice saying "open the door or I will kick it in").

Thus, because the Marshals established that they were in a situation where the policy directive gave them discretion to use force, the Court finds that the United States satisfies the first prong of the discretionary-function exception. *See Herden*, 726 F.3d at 1046. This is consistent with the Eighth Circuit's holding that "[l]aw enforcement decisions of the kind involved in making or terminating an arrest must be within the discretion and judgment of enforcing officers." *Deuser*, 139 F.3d at 1195; *see also Hart v. United States*, 630 F.3d 1085, 1090 (8th Cir. 2011) (concluding that "a federal law enforcement officer's on-the-spot decisions concerning how to effectuate an arrest—including how to best to restrain, supervise, control or trust an arrestee—fall within the discretionary function exception to the FTCA absent a specific mandatory directive to the contrary").

10

### 2.    Policy

The Court must next determine whether the Marshals' actions were "based on considerations of social, economic, and political policy." *Herden*, 726 F.3d at 1047 (quoting *Layton*, 984 F.3d at 1499).  The focus of this inquiry "is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325.

Given that the Marshals exercised discretion in executing White's arrest warrant, the Court presumes that their discretion was "grounded in policy considerations." *Buckler*, 919 F.3d at 1046 (quoting *Herden*, 726 F.3d at 1048).  Thus, Ramey, as plaintiff, must rebut this presumption. *Id.*  And because Ramey did not file a response to the United States' Motion to Dismiss, the Court looks to Ramey's Petition to see if she rebutted the presumption.  Doc. 2. Liberally construing Ramey's Petition, *see Estelle*, 429 U.S. at 106, the Court finds that she has not done so.

In her Petition, Ramey alleges that the Marshals acted "with the voice[,] tone[,] and spirit of KKK/white supremacists," that they "would not have treated an elderly white woman" the way they treated her and "were too harsh with [White]," and that they were "militant" and "radical." Doc. 2 at 2.  Her allegations focus on the subjective intent of the Marshals in carrying out White's arrest, rather than on whether the Marshals' actions were susceptible to policy analysis. *See Gaubert*, 499 U.S. at 325.  And to the extent Ramey argues that the Marshals abused their discretion in arresting White, federal law and Eighth Circuit precedent foreclose her argument. *See* 28 U.S.C. § 2680(a) (limiting the United States' waiver of sovereign immunity "based upon the exercise or performance or the failure to exercise or perform a discretionary

11

function or duty on the part of a federal agency or an employee . . . *whether or not the discretion involved be abused*" (emphasis added)); *Buckler*, 919 F.3d at 1045–46 (noting same).

The United States argues that the Marshals' "discretionary decision about how to arrest White and whether to breach the front door to effectuate the arrest are both susceptible to policy considerations." Doc. 13 at 11. The Court agrees. The Eighth Circuit has found that decisions by law enforcement officers about how to best effectuate an arrest warrant are "quintessential examples of the permissible exercise of policy judgment." *Hart*, 639 F.3d at 1091. That is because, in conducting an arrest, a law enforcement officer must consider (1) his training, (2) "the need to restrain [the arrestee]," (3) "the concern for [the arrestee's] safety," (4) "the public's safety," (5) "his available resources," and (6) "the information at hand in determining the proper course of action." *Id.* (quoting *Williams v. United States*, 314 F. App'x 253, 257–58 (11th Cir. 2009)). Here, the Marshals believed that White could have been armed at the time of his arrest, because "both of his outstanding warrants were for violations of laws involving the possession of a firearm." Doc. 13-1 at 2. Therefore, in carrying out White's arrest, the Marshals needed to consider this information, as well as concerns about their safety, the safety of Ramey and White, and the safety of the public. *See Hart*, 639 F.3d at 1091. Thus, the Court finds that the United States meets the second prong of the discretionary-function exception. *See Herden*, 726 F.3d at 1047.

In sum, the Court finds that the United States has satisfied both prongs of the discretionary-function exception. *See id.* Thus, the exception applies, sovereign immunity protects the United States from suit, and the Court lacks jurisdiction over Ramey's claim.

## IV. Conclusion

Accordingly, the Court discharges its [14] Show-Cause Order and grants the United States' [12] Motion to Dismiss. The Court therefore dismisses this case without prejudice. *See Hart*, 630 F.3d at 1091. A separate order of dismissal accompanies this Memorandum and Order.

So ordered this 26th day of May 2026.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE